**NOT FOR CITATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RICHARD D. BOSWELL,

          Petitioner,

    v.

CHERYL PLILER, Warden,

          Respondent.

_____/

No. C 01-3826 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. After denying respondent's motion to dismiss the petition as untimely, the court ordered respondent to show cause why the writ should not be granted. Respondent has filed an answer and a memorandum of points and authorities in support of it, and has lodged supporting exhibits. Petitioner has responded with a traverse. The case is ready for decision.

**BACKGROUND[1]**

On January 7, 1998, a man used a gun to rob a Kentucky Fried Chicken restaurant on Del Monte Boulevard in Marina, California. During the robbery, the man fired a shot past the head of the employee who was getting the money out of the cash register. After leaving the store with the money, the man approached a restaurant employee who had run into the parking lot and pointed the gun at his head, asking him what he was looking at. The robber then left. Police retrieved bullet fragments from the crime scene.

On January 15, 1998, a man used a gun to rob the Family Video Store on Reservation Road in Marina. The employee at the cash register opened the drawer and

_____

[1]The factual and procedural backgrounds are taken from the exhibits lodged by respondent in support of the answer, and those filed earlier by respondent in support of the motion to dismiss.

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

then ran to hide behind a counter in the rear of the store.  The man took the money from the cash register and then approached the employee, putting the gun to her head and telling her that if she did not give him her purse, he would shoot and rape her.  The employee gave the man a money bag.  The man then approached two teenage customers hiding behind a video shelf.  He told them that he should shoot them all.  He then left the store.  Police obtained latent fingerprints off the rear inside pull plate of the entrance door to the store.

On January 28, 1998, a man and a young woman entered Arnaldo's Jewelers on Reservation Road in Marina.  They pretended to be looking for an engagement ring.  They also asked to see some bracelets, and the man leafed through a catalog in the store, leaving behind his fingerprint.  The man then approached the owner, Rodolfo Arnaldo, who was working at a display counter.  Without warning, conversation or provocation, the man pulled out a gun and shot Mr. Arnaldo in the chest, causing a fatal wound.  The man pointed the gun at Mr. Arnaldo's wife and told her to lie on the floor, and then turned the gun on a store employee, telling her to get the jewelry, which the man then directed the young woman with him to take.  The two then fled the store.

On January 31, 1998, petitioner was arrested.  He was charged with the first degree murder of Rodolfo Arnaldo, five counts of second-degree robbery with the use of a firearm, one count of commercial burglary, and one count of assault with a semiautomatic firearm.  At petitioner's arraignment the state said it would seek the death penalty.  On August 19, 1999, petitioner pleaded guilty to the enumerated crimes in exchange for a sentence of life without the possibility of parole.

The trial court denied petitioner's applications for a certificate of probable cause to appeal the plea agreement.  Petitioner then filed a petition for writ of habeas corpus in the California Court of Appeal, which was summarily denied.  He then filed a petition for writ of habeas corpus in the California Supreme Court, which also was summarily denied.

As grounds for habeas relief, petitioner asserts that: (1) his trial counsel rendered ineffective assistance in regard to counsel's negotiation of, and advice concerning, the

**United States District Court**
For the Northern District of California

terms and conditions of his plea agreement; (2) his plea was involuntary because he was not informed of the actual terms and consequences of the plea agreement; and (3) the plea agreement was breached by the prosecution.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2001), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in

**United States District Court**
For the Northern District of California

1  light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340;

2  *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).  Section 2254(d)(2) applies

3  to intrinsic review of a state court's process, or situations in which the petitioner challenges

4  the state court's findings based entirely on the state court record.  *Taylor v. Maddox*, 366

5  F.3d 992, 999-1000 (9th Cir. 2004).  The relevant question under § 2254(d)(2) is whether

6  an appellate panel, applying the normal standards of appellate review, could reasonably

7  conclude that the state court findings are supported by the record.  *Lambert v. Blodgett*,

8  393 F.3d 943, 978 (9th Cir. 2004).

9        Section 2254(e)(1) applies to challenges based on extrinsic evidence.  *Taylor*, 366

10  F.3d at 1000.  Under this section, a district court must presume correct any determination

11  of a factual issue made by a state court unless the petitioner rebuts the presumption of

12  correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  Conclusory

13  assertions will not do.  *Taylor,* 366 F.3d at 1000.

14        The state court decision to which 2254(d) applies is the "last reasoned decision" of

15  the state court, *see Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*,

16  423 F.3d 1085, 1091-92 (9th Cir. 2005).

17                              **DISCUSSION**

18  *A.    Ineffective Assistance of Counsel*

19        *1.    Background*

20        There is no state court opinion which summarizes the facts underlying petitioner's

21  ineffective assistance of counsel claims.  In support of her answer to the petition,

22  respondent has lodged exhibits which document the historical background leading up to the

23  entry of petitioner's guilty plea, including declarations from the three attorneys appointed to

24  represent petitioner at various stages of his criminal proceedings, documents from the

25  investigations into the crimes with which petitioner was charged, and documents regarding

26  petitioner's prior history in the criminal justice system.  *See* Respondent's Exhibits 1-14.

27  Respondent has summarized much of this background in her memorandum of points and

28  authorities in support of the answer.  Although petitioner makes objections to some of

respondent's characterizations (which are discussed later in this order), he does not dispute

the underlying course of events.  Accordingly, the Court includes here respondent's

summary of the facts relevant to petitioner's ineffective assistance of counsel claims.[2]

> Petitioner was represented at trial by three different attorneys – Romano Clark, Deputy Public Defender for Monterey County; Fred Herro, a private attorney in Salinas, California, and former Public Defender for Monterey County; and John Doyle, a private attorney in San Francisco, California.  *See* Exhibits 6-8.  Mr. Clark was appointed to represent petitioner right after his arraignment, and assumed duties as lead counsel.  Exhibit 6 at 1.  Mr. Herro was appointed much later in the case, on or about 1 August 1999, as "Kennan" Counsel.  His primary area of responsibility was to prepare for a possible penalty phase.  Exhibit 7 at 2: *see Kennan v. Superior Court*, 31 Cal.3d 424, 429 (1982).  Mr. Doyle was appointed to assist Mr. Clark with preparing and presenting pretrial motions.  Exhibit 8 at 1.  All three attorneys were well-experienced criminal defense practitioners.
>
> Mr. Clark began practicing law as a Deputy District Attorney in Monterey County in January 1970.  He remained in that position until November 1982, when he began a small private practice, concentrating primarily on criminal and domestic cases.  He left private practice in January 1985, joining the Monterey County Public Defender's Office.  He has been with that office since then.  Exhibit 6 at 1.
>
> Contrary to petitioner's contention, Mr. Clark was not inexperienced with capital cases.  Mr. Clark had participated in several capital cases prior to petitioner's, although the prosecution ultimately decided not to seek the death penalty in those cases after the preliminary hearing had concluded.  Mr. Clark had also attended several California Public Defender's Association death penalty conferences, which dealt with the defense of death penalty cases.  Petitioner's case was the first case where Mr. Clark had to "fully prepare to defend the death penalty phase elements."  Exhibit 6 at 2.
>
> Mr. Herro has been a licensed attorney in California since January 1970.  He worked for the California Court of Appeal, Fourth Appellate District, as a research attorney until October 1971, when he accepted employment with the Riverside County Public Defender's Office.  As a Riverside County Public Defender, he tried cases ranging from juvenile proceedings to serious felonies.  Because the former capital punishment law had been found unconstitutional, he did not try any capital cases with that office.  In October 1973, Mr. Herro began working for the Monterey County Public Defender's Officer.  He was continuously employed there until April 1999, when he retired and opened a small private practice in Salinas.  Exhibit 7 at 1.
>
> While at the Monterey County Public Defender's Officer, Mr. Herro was assigned to six capital cases, two of which went to a penalty phase trial.  In

---

[2]The exhibits referenced in the summary are those lodged by respondent in support of her answer.  Exhibit 6 is Mr. Clark's declaration; Exhibit 7 is Mr. Herro's declaration; Exhibit 8 is Mr. Doyle's declaration.  Because the parties rely on respondent's exhibits in support of their arguments, and the Court relies on the exhibits in support of its ruling, the clerk of the court will be directed to file respondent's lodged Exhibits 1-14 as part of the record in this case.

**United States District Court**
For the Northern District of California

neither of the cases that proceeded to a penalty phase did his client receive a death sentence. In the other four cases, there was either a plea agreement involving a sentence less than death, or the District Attorney later decided not to pursue a death sentence, even though the case went to trial. Although petitioner's case was being handled by the Monterey County Public Defender's Office prior to his retirement, Mr. Herro had no active involvement with it at that time. Exhibit 7 at 2.

Attorney Doyle has been a licensed attorney since September 1965, when he was admitted to practice in Texas. He was admitted to practice in California in June 1972. Exhibit 8 at 1.

Soon after Mr. Clark was appointed to petitioner's case, he hired investigator Gary St. Clair to assist him in investigating the facts and circumstances relevant to the guilt phase of the trial. He also had Mr. St. Clair "do some investigation" for the anticipated penalty phase of the trial. Mr. Clark also hired a Nebraska investigator to assist with the penalty phase investigation, because petitioner had lived in Nebraska for a substantial portion of his youth. Exhibit 6 at 2.

While preparing to defend petitioner's case, Mr. Clark used the California Public Defender's Association Death Penalty Manual extensively. He also consulted with San Francisco attorney Michael Burt, a nationally recognized expert in death penalty defense, about petitioner's case. Additionally, he retained Dr. Craig Haney, a psychologist, and a neurologist whose name he no longer recalls, in an unsuccessful effort to develop any mental health defense or mitigation information. Mr. Clark obtained petitioner's school records and retained Margie Ericson, an investigator with expertise in preparing social histories, to prepare petitioner's social history. He also retained Dan Alexander, an expert on juvenile justice matters, to testify that petitioner "was inappropriately treated in the Nebraska juvenile justice system, and how his treatment would have been different in the California juvenile justice system." Exhibit 6 at 2-3.

Mr. Clark states that he "vigorously prepared" to go to trial. Exhibit 6 at 2. In addition to the retention of experts and the investigation outlined above, Mr. Clark met with petitioner "at least 60 times" during the course of his representation to discuss a variety of matters related to the case. Mr. Clark estimates that each session with petitioner averaged "at least 2 hours." Exhibit 6 at 2. Over the course of his representation of petitioner, Mr. Clark, with the assistance of Mr. Doyle, filed numerous motions challenging various aspects of the prosecution case, e.g., challenging standing, challenging search warrants, and moving to suppress evidence, to change venue, and to obtain discovery. Exhibit 6 at 3; Exhibit 8 at 1. They even filed a mandate petition in the California Court of Appeal regarding the denial of their Cal. Penal Code § 1538.5 motion [to suppress]. Exhibit 8 at 1-2.

Mr. Clark's "overriding goal," throughout his representation of petitioner, was to keep him from receiving a death sentence. He evaluated petitioner's case, "based on the totality of the circumstances," as one where a death sentence was "highly probable" if it went to trial. Accordingly, Mr. Clark felt it was his "duty to explore all avenues to keep Mr. Boswell from facing and receiving a death sentence." Exhibit 6 at 2.

Petitioner initially told Mr. Clark "that he did not want to plead guilty in

exchange for a sentence of life without the possibility of parole (LWOP), and was against pleading guilty to anything, in general." Exhibit 6 at 3. However, as time progressed, Mr. Clark felt that the case against petitioner became worse, as more evidence about the crimes and petitioner's background came to light. Mr. Clark also considered the prosecutor, Deputy District Attorney McCardle, to be an opponent "who would present the strongest possible case for the State." Exhibit 6 at 3.

Mr. Clark states that, in Monterey County, if a case involves special circumstances, the District Attorney makes no decision on whether or not to seek the death penalty "until sometime after the preliminary hearing has been completed." Exhibit 6 at 3. This was true in petitioner's case, as well.

Mr. Clark first met with the District Attorney, Mr. Flippo, his primary assistants, Mr. McCardle, and the chief and primary investigators for about an hour shortly before petitioner's arraignment in superior court. At the time, he had been working on petitioner's case for about three to four months, and felt he had a "fair opportunity to look into the facts and circumstances" of the case. Exhibit 6 at 3. At this meeting, Mr. Clark argued what he considered to be important factors in petitioner's background that militated against the State seeking the death penalty. He "informed Mr. Boswell about this meeting, describing my effort as one to get the District Attorney to pull the death penalty off of the table with the possibility of still going forward to trial." Exhibit 6 at 3. Later, at the arraignment, Mr. McCardle informed Mr. Clark that the State intended to seek the death penalty. "For about the next year, the District Attorney was closed to any discussions about not seeking a death sentence." Exhibit 6 at 3. Nevertheless, Mr. Clark was not deterred. He was determined to continue his efforts to keep petitioner from receiving a death sentence.

At the time petitioner's case was proceeding through the trial court, Mr. Clark was aware of three other death penalty cases that were also being prosecuted by the Monterey County District Attorney. These cases received "a lot of press coverage which resulted in Mr. Boswell's case constantly being mentioned in the media as well." Exhibit 6 at 4.

Among the facts considered by Mr. Clark to be extremely damaging to petitioner are the following: First, the victim in petitioner's case, Mr. Arnaldo, was someone who was 'well-regarded' in the community. Second, the facts showed that petitioner approached Mr. Arnaldo and, "without arguing, conversation or provocation," shot Mr. Arnaldo at "point-blank range through the heart." Exhibit 6 at 4. Petitioner immediately ordered his girlfriend, Jasmine Brandl, to grab the jewelry, after which they both fled the scene. They were apprehended several days later in Sacramento. Third, as time passed, the driver of the getaway car, Michael Thornton, a juvenile, confessed to his role in the crime and pleaded guilty to first degree murder as a juvenile. "Similarly, Jasmine Brandl also decided to cooperate with the State and pleaded guilty to second degree murder with a sentence of 15 years to life, as an adult." Exhibit 6 at 4. Both Thornton's and Brandl's plea agreements required them to testify for the State against petitioner. Exhibit 6 at 4. Mr. Clark explained this information to petitioner and told him that he thought Thornton and Brandl "would be extremely strong witnesses against him." Exhibit 6 at 4. However, because the District Attorney refused to seek anything less than the death penalty, Mr. Clark "did not encourage Mr. Boswell to plead guilty." Exhibit 6 at 4.

United States District Court

For the Northern District of California

Another factor that Mr. Clark found particularly harmful to petitioner was that, in addition to Thornton and Brandl agreeing to testify against him, petitioner's sister and brother–in–law, who were charged as accessories, also entered into plea agreements which required them to testify for the State, as well. "One particularly damaging statement" to which petitioner's sister would testify "was that Mr. Boswell said he wanted to see what it was like to kill someone." Exhibit 6 at 4.

Mr. Clark also learned of numerous examples of derogatory background information the prosecution was prepared to present if petitioner's case went to a sentencing hearing. This included such things as petitioner's arrest for robbing another child of his bike, by hitting him with a brick; stealing firearms; burglarizing his step-grandmother's home and stealing her purse. "From age 14 until age 23, [petitioner] had a lengthy history of assaulting correctional personal [sic] and was convicted as an adult for his assault on correctional staff." Petitioner had "over 250 documented disciplinary infractions" while in the Nebraska penal system. Exhibit 6 at 5. And, Mr. Clark learned from his Nebraska investigator that the counselors and staff, including the victims of petitioner's disciplinary problems were available to testify and would opine that, "if Mr. Boswell was allowed to live, he would continue to attack prison staff and other inmates." Exhibit 6 at 5.

One other fact that Mr. Clark also viewed as being very detrimental to petitioner's case was that the crimes for which he was to be tried in California were committed only three weeks after he had been released from prison in Nebraska, "after serving his maximum term" for assault on correctional staff. Exhibit 6 at 5.

Mr. Clark "discussed" his assessment of the "strengths and weaknesses of both the guilt and penalty phase" portions of the case with petitioner on numerous occasions. He also discussed with petitioner the other local death penalty cases then progressing through the trial court, including one that Mr. Clark viewed as not boding well for petitioner. In this other case, the defendant was white, whereas petitioner was black, and the other defendant did not have the "extensive history of violence" that petitioner had, yet the other defendant received a death sentence from the jury. Mr. Clark considered petitioner's case to be "nowhere near as sympathy-garnering as these other capital cases." Exhibit 6 at 5-6.

Another factor that entered into Mr. Clark's overall strategic evaluation of petitioner's case was Mr. Clark's belief that petitioner should not testify at either phase of the trial. Mr. Clark "did not believe [petitioner] would present himself favorably. His demeanor was uncomfortable. And, although he was well-behaved during court appearances, I perceived his appearance to be intimidating – something that would work to his disadvantage with the jury." Exhibit 6 at 5.

With the above considerations in mind, Mr. Clark continued his attempts to persuade petitioner to allow him to negotiate a plea agreement for a sentence less than death. Finally, about three weeks before the trial was scheduled to begin, petitioner "came around to the idea of accepting a plea." Significantly, Mr. Clark states that, although Mr. Boswell was initially against any plea agreement, he never told Mr. Clark "to stop my plea negotiations with the District Attorney. He always concurred in the actions I took." Exhibit 6 at 6 [italicized emphasis omitted].

United States District Court

For the Northern District of California

Mr. Clark prepared a memorandum, dated 13 August 1999, requesting that the District Attorney "consider allowing a plea of guilty to all charges in exchange for a sentence of LWOP." Mr. Clark showed this memorandum to petitioner, who did not object to it. Exhibit 6 at 6; *see* Exhibit 9. Prior to appearing before the District Attorney's Committee to formally present the plea offer, Mr. Clark consulted with Mr. Herro about pursuing such a plea. Exhibit 7 at 2. After discussing the matter with the victim's wife, the District Attorney agreed to accept the plea offer. Exhibit 6 at 6. Mr. Clark informed Mr. Herro of this acceptance. Exhibit 7 at 2.

Prior to actually receiving the written plea agreement from the District Attorney, Mr. Clark had preliminary discussions with petitioner about what terms he expected it to contain. Exhibit 6 at 6. Mr. Herro was not present for this meeting. Exhibit 7 at 2-3. It was sometime after this meeting with petitioner that Mr. Clark received the "detailed waiver of rights and plea form from the District Attorney." Exhibit 7 at 3.

Although Mr. Herro can no longer recall the exact date, he does recall having discussions with Mr. Clark about the plea agreement before it was presented to petitioner. Exhibit 7 at 3.

The day before petitioner actually entered his plea, Mr. Clark and Mr. Herro visited him. Exhibit 6 at 6; Exhibit 7 at 3. According to Mr. Herro, the meeting "probably lasted a couple of hours." Exhibit 7 at 3. It was during this meeting that "Mr. Clark thoroughly explained the plea agreement, including the waivers required by the District Attorney, to Mr. Boswell." Exhibit 7 at 3. As Mr. Clark recalls it, he spent "at least 45 minutes going over the plea agreement with [petitioner]." Exhibit 6 at 6. Mr. Clark disputes petitioner's claim that he withheld "any of the actual terms of the plea bargain from him." Exhibit 6 at 6. While the plea agreement "contained more severe waiver provisions" than Clark had anticipated, Clark's considered professional judgment was that it was still in petitioner's "best interest to accept it." Exhibit 6 at 6.[3] Mr. Clark also informed petitioner that it was both his opinion and Mr. Herro's opinion that none of the waiver provisions about appellate/collateral action rights were enforceable "if there was a jurisdictional error, or if fraud or misrepresentation/perjury were proved." Exhibit 6 at 6.

* * *

Mr. Herro, who is a very experienced criminal defense attorney, observes:

I do not recall Mr. Clark doing or saying anything improper or incorrect during his discussion of the plea agreement with Mr. Boswell. Had he done so, I would have intervened and called him aside to discuss the matter with him. By way of explanation, I would have considered it improper for Mr. Clark to lean heavily on Mr. Boswell in order to get him to accept his recommendation that he accept the plea. I do not consider it proper for any attorney to tell his client what to do. The attorney should always let the client make the ultimate decision and take responsibility for that decision.

Exhibit 7 at 3.

---

[3]Attorney Doyle concurred in this assessment as well, although he never communicated this assessment to petitioner. Exhibit 8 at 2.

United States District Court

For the Northern District of California

Neither Mr. Clark nor Mr. Herro believed that petitioner did not understand the terms and conditions of the plea agreement to which he agreed.  Exhibit 6 at 7; Exhibit 7 at 3.  Although Mr. Herro does not recall any specific question petitioner might have asked, he feels petitioner understood the agreement.  Exhibit 7 at 3.  Petitioner understood that his pleas of guilty meant he was saying he committed the crimes charged and was receiving an LWOP sentence.  Exhibit 6 at 7.  And, although petitioner was not thrilled at this prospect, he understood that it was the "best he could expect under the circumstances of his case."  Exhibit 7 at 3.  Petitioner certainly understood Mr. Clark's reasons for seeking the agreement and the reasons for Mr. Clark's counseling that he accept the agreement.  Exhibit 6 at 7.

Respondent's Memorandum of Points and Authorities in Support of Answer ("Memorandum") at 11-19.

2.      *Applicable Federal Law*

The only challenges left open in federal habeas corpus after a guilty plea are to the voluntary and intelligent character of the plea and the nature of the advice of counsel to plead.  *See Hill v. Lockhart*, 474 U.S. 52, 56-57 (1985); *Tollett v. Henderson*, 411 U.S. 258, 267 (1973).  A defendant who pleads guilty upon the advice of counsel may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the range of competence demanded of attorneys in criminal cases.  *Hill*, 474 U.S. at 56.  In order to do so, he must satisfy the two-part standard of *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and show both that counsel's performance fell below an objective standard of reasonableness, and that the deficient performance prejudiced his defense.  *Id.*  In order to establish prejudice, he must show there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.  *See Hill*, 474 U.S. at 57-59; *Iaea v. Sunn*, 800 F.2d 861, 864-65 (9th Cir. 1986).  The *Strickland* framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis.  *See Williams*, 529 U.S. at 404-08.

//

3.      *Analysis*

**United States District Court**
For the Northern District of California

1

*a.     Counsel's Advice to Plead Guilty*

2     During the plea colloquy, petitioner admitted that he was guilty of the crimes

3     charged.  *See* Exhibit 10 at 6817-24.  He contends, however, that because he continued to

4     assert his innocence during counsel's pursuit and negotiation of the plea agreement, and

5     made clear to counsel his objections to pleading guilty, the plea was involuntary.  He claims

6     that counsel advised him to plead guilty only because counsel did not want to go to trial and

7     was not prepared to do so.

8     A guilty plea is not rendered involuntary simply because a defendant professes his

9     innocence of the crimes with which he is charged.  *See North Carolina v. Alford*, 400 U.S.

10    25, 37 (1970) ("An individual accused of crime may voluntarily, knowingly, and

11    understandingly consent to the imposition of a prison sentence even if he is unwilling or

12    unable to admit his participation in the acts constituting the crime.").   Rather, even if a

13    defendant refuses to admit commission of the criminal act or enters a plea containing a

14    protestation of innocence, the plea will be voluntary as long as "a defendant intelligently

15    concludes that his interests require entry of a guilty plea and the record before the judge

16    contains strong evidence of actual guilt."  *Id.*

17    In advising a defendant whether to plead guilty, "[c]ounsel cannot be required to

18    accurately predict what the jury or court might find, but he can be required to give the

19    defendant the tools he needs to make an intelligent decision."  *Turner v. Calderon*, 281

20    F.3d 851, 881 (9th Cir. 2002).  Strategic choices made by counsel after thorough

21    investigation of law and facts relevant to plausible options are virtually unchallengeable.

22    *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 508 (9th Cir. 1994).  Here, the record shows

23    that counsel's advice to petitioner was based on a thorough investigation of the law and

24    facts relevant to the plausible options.  Moreover, the record contains strong evidence of

25    petitioner's actual guilt.

26    Petitioner argues that, had he gone to trial, there exists a possibility that he would

27    have been acquitted of all or some of the charges because of the existence of "perjury and

28    fabricated evidence" of his guilt, which counsel addressed in pretrial motions (which were

United States District Court

For the Northern District of California

1  denied).  Petitioner never states what this evidence was, however, and in his declaration

2  Mr. Clark states that, "At no time have I ever had any reason to believe that there was any

3  perjured testimony that the District Attorney intended to rely on if the case went to trial, or

4  that the District Attorney ever committed a fraud on the court."  Exhibit 6 at 7.   Petitioner

5  also does not show that counsel failed to investigate or attempt to discover such evidence.

6  In fact, petitioner's assertion that the defense filed pretrial motions regarding such evidence

7  leads to the opposite conclusion.  In any event, petitioner's conclusory allegations are

8  insufficient to establish a likelihood that, had counsel continued to investigate this issue, he

9  would have discovered evidence which would have led him to change his recommendation

10  as to the plea.  *See Hill*, 474 U.S. at 59.

11       Petitioner also asserts that there is a possibility that he would have been acquitted at

12  trial because even if the two individuals who were charged as his accomplices to the

13  felony-murder testified against him – as was required under the terms of their plea

14  agreements – that testimony would not, standing alone, have been enough for the jury to

15  convict him without other corroborating evidence.  However, Mr. Clark's assessment of the

16  accomplices' testimony was that they "would be extremely strong witnesses" against

17  petitioner.  Exhibit 6 at 4.  Moreover, other corroborating identification evidence did exist, in

18  the form of witness identification of petitioner, and his fingerprint at the jewelry store.

19       Petitioner further speculates on the possibility of acquittal because he says his sister

20  would not have testified that he told her that he wanted to know what it felt like to kill

21  someone, which is a statement she made after being arrested as an accessory to

22  petitioner's crimes.  However, according to Mr. Clark, petitioner's sister had entered into a

23  plea agreement which required her to testify against him at trial.  Moreover, even without

24  this testimony, substantial other evidence existed which implicated petitioner in the murder.

25       Petitioner also asserts that the record shows that Mr. Clark knew that he did not

26  want to plead guilty, as evidenced by a statement Mr. Clark made to the court during the

27  plea colloquy.  Specifically, after questioning petitioner in detail and obtaining his affirmative

28  response that he understood the nature of the charges to which he was pleading guilty and

12

United States District Court

For the Northern District of California

1  the consequences thereof, the court then asked petitioner:

2      And that's exactly what you want to do, and the reason you are doing that is
       in exchange for having the district attorney drop the possibility of the death
3      penalty being imposed; is that correct?

4  At which point Mr. Clark responded:

5      Your Honor, just as it's not a quid pro quo to him.  He is simply taking
       responsibility for all of these acts and understands the court is going to
6      impose the sentence.

7  Exhibit 10 at 6824.

8      Petitioner claims that Mr. Clark's statement shows that Mr. Clark knew that he was

9  not voluntarily entering the plea as an admission of guilt in exchange for a sentence of life

10  without the possibility of parole.  In response to this assertion, Mr. Clark states in his

11  declaration:

12     With regard to the comment I made to the trial judge at the plea hearing that
       Mr. Boswell did not see the plea agreement as a "quid pro quo" for his LWOP
13     sentence, it was my effort to make clear to the court and for the record, that
       Mr. Boswell wanted it known that he was not afraid to die.  It was not a
14     comment intended to show that Mr. Boswell was not knowingly and voluntarily
       entering into the plea agreement.  The plea agreement was a bargain to
15     which Mr. Boswell was agreeable.  He understood that his pleas of guilty
       meant that he was saying he committed the crimes charged, and was
16     receiving an LWOP sentence.

17  Exhibit 6 at 7.  Petitioner counters that if Mr. Clark was really trying to say that petitioner

18  was not afraid to die, he would have gone to trial and let petitioner face the prospect of a

19  death sentence.

20     Petitioner bears the burden of proof on the issue of deficient performance, and must

21  offer evidentiary support in order to meet this burden.  *See Toomey v. Bunnell*, 898 F.2d

22  741, 743 (9th Cir. 1990).  He has not done so here.  While it is undisputed that petitioner

23  told Mr. Clark for several months prior to trial that he did not want to plead guilty in

24  exchange for a sentence of life without the possibility of parole, petitioner's contentions do

25  not call into question the competence of counsel's decisions to negotiate a guilty plea and

26  advise petitioner to plead guilty, when ongoing investigations in the weeks before trial

27  revealed increasingly harmful evidence against him.  Nor do they lead to the conclusion

28  that petitioner's plea was involuntary, even though he was not thrilled with the prospect of

**United States District Court**
For the Northern District of California

1   having to do so.

2   Moreover, even if counsel's performance was deficient, petitioner has not

3   established prejudice, that is, he has not shown that there is a reasonable probability that,

4   but for counsel's errors, he would not have pleaded guilty and would have insisted on going

5   to trial. *See Hill*, 474 U.S. at 57-59; *Weaver v. Palmateer*, 455 F.3d 958, 967 (9th Cir.

6   2006). A petitioner generally cannot establish prejudice if he received significant benefits

7   from his plea agreement. *See id.* Petitioner maintains that he received no benefit from the

8   plea bargain because he was willing to face the death penalty, and if he went to trial he

9   could have ended up either with a death sentence, with a sentence of life without the

10  possibility of parole, or with an acquittal. Petitioner's asserted willingness to go to trial and

11  face the death penalty appears to hinge on his contention that he would not have been

12  found guilty or, if he would have, the conviction could not stand because of the alleged

13  fraudulent and flawed evidence against him, discussed above. The Court finds petitioner's

14  assertions insufficient to establish prejudice, however, because, as discussed above, his

15  evidentiary allegations are unpersuasive. Thus, it is reasonably probable that had he gone

16  to trial he would not have been acquitted, and he would have been found guilty of felony-

17  murder, which carries a mandatory sentence of death or life without the possibility of

18  parole. *See California Penal Code § 190.2(17).* It is also reasonably probable that he

19  would have received the death penalty, based upon Mr. Clark's assessment of the relevant

20  evidence, which petitioner has not rebutted. Although petitioner claims that he was

21  prejudiced because he would have gone to trial, his conclusory assertions fail to support

22  such a finding. *See Rios v. Rocha*, 299 F.3d 796, 813 n.23 (9th Cir. 2002) (rejecting two

23  ineffective assistance of counsel claims based on petitioner's failure to produce evidence of

24  prejudice)

25              *b.     Counsel's Advice About the Consequences of the Plea*

26  Petitioner maintains that his plea is invalid because of counsel's advice regarding the

27  consequences of the plea. Initially, Mr. Clark informed petitioner that he would not be

28  required to waive his right to challenge and appeal the denial of pretrial motions which

United States District Court

For the Northern District of California

1   addressed matters of fraud and perjury by the prosecution.  However, the final plea

2   agreement required him to waive the right to appeal any and all issues relating to the case

3   in state or federal court, the right to pursue any type of writ challenging any aspect of the

4   case in state or federal court, and the right to withdraw his guilty pleas in state or federal

5   court.  Petitioner claims that in order to get him to sign the plea agreement, Mr. Clark lied

6   and told him that despite the waiver he could still file motions with the court based on

7   evidence of fraud and perjury as alleged in the pretrial motions, and that the plea

8   agreement would not be enforceable if fraud or perjury were proved.  Petitioner claims that

9   had he known Mr. Clark's assertions were false, he would have chosen to go to trial rather

10   than plead guilty.

11       In response to petitioner's assertions, Mr. Clark states in his declaration:

12       Contrary to Mr. Boswell's claim, I did not withhold any of the actual terms of
         the plea bargain from him.  And, while the plea agreement contained more
13       severe waiver provisions than I anticipated, I still felt it was in his best interest
         to accept it.  I fully discussed the terms of the plea agreement with Mr.
14       Boswell, including the waiver provisions it contained with regard to appeals
         and collateral writs. . . . I also discussed with Mr. Boswell the fact that in our
15       (Mr. Herro's and my) opinion, these waiver provisions were not enforceable if
         there was a jurisdictional error, or if fraud or misrepresentation/perjury were
16       proved.

17   Exhibit 6 at 6.

18       Petitioner claims that his waiver was not valid because Mr. Clark erroneously

19   advised him that he would be able to appeal his pretrial motions, even though the waiver

20   expressly stated that he could not.  An express waiver of the right to appeal in a negotiated

21   plea of guilty is valid if knowingly and voluntarily made.  *See United States v. Nguyen*, 235

22   F.3d 1179, 1182-84 (9th Cir. 2000).  However, there are some exceptions to the

23   enforceability of such waivers.  *See, e.g., United States v. Petty*, 80 F.3d 1384, 1387 (9th

24   Cir. 1996) (waiver cannot be enforced with respect to a substantial violation which arose

25   only after the agreement was signed and which could not have been anticipated); *United*

26   *States v. Johnson* 67 F.3d 200, 202 (9th Cir. 1995) (listing several types of cases in which

27   waivers would be unenforceable, including breach of the plea agreement, racial disparity in

28   sentencing among codefendants, and an illegal sentence); *cf. Washington v. Lampert*, 422

15

United States District Court

For the Northern District of California

F.3d 864, 871 (9th Cir. 2005) (waiver of the right to file a federal habeas petition is unenforceable with respect to an ineffective assistance of counsel claim that challenges the voluntariness of the waiver).[4]

During the plea colloquy, the trial court explained to petitioner that by entering into the plea agreement he would be waiving all appellate rights, Exhibit 10 at 6809-10, and petitioner expressly stated that he understood the terms of the waiver, Exhibit 10 at 6824-25. Thus, on its face, the waiver was valid. Moreover, even if petitioner relied upon counsel's advice that he could still raise the challenges already rejected in his pretrial motions upon a showing of fraud or misrepresentation, he has not shown that this advice was erroneous. *See, e.g., Von Moltke v. Gillies,* 332 U.S. 708, 710 (1948) (showing that plea was entered into by reason of coercion, intimidation, and deception of federal officers would invalidate plea and sentence). That is, he has not alleged that since he entered his plea he has attempted to present, in state appellate or post-conviction proceedings, specific evidence of fraud or perjury by the prosecution, which has been rejected by the state courts because of the waiver.

However, even if counsel did erroneously advise petitioner that he could continue to pursue pretrial matters despite the waiver, that inaccurate prediction, standing alone, would not constitute ineffective assistance. *Iaea*, 800 F.2d at 865. Rather, petitioner must also show that he suffered prejudice because of counsel's advice. The Court finds that petitioner has not done so, because he has presented no evidence whatsoever which shows that, but for the waiver, he could have prevailed on these matters on appeal. Without such a showing, and in light of the substantial inculpatory evidence against him, petitioner's conclusory assertion that he would have gone to trial and faced the death penalty rather than waive his right to appeal these pretrial matters is insufficient to establish ineffective assistance.

---

[4]As respondent notes, she has made no attempt to enforce the waiver provision barring petitioner from pursuing federal habeas corpus relief, and the Court finds that the waiver is unenforceable with respect to petitioner's ineffective assistance of counsel claim.

United States District Court
For the Northern District of California

1

                *c.*     *Whether the Plea Was Coerced*

2

      A guilty plea induced by promises or threats which deprive it of the character of a

3

voluntary act is void. *Machibroda v. United States*, 368 U.S. 487, 493 (1962), *see Iaea*,

4

800 F.2d at 866-68 (remanded to determine if threat by counsel to withdraw and threat by

5

petitioner's brother to withdraw bail unless petitioner pleaded guilty rendered plea

6

involuntary).            Petitioner claims that he was coerced into pleading guilty, as

7

evidenced by the following interaction which occurred during the plea colloquy.  After

8

explaining to petitioner the terms of the plea agreement and the consequences thereof, and

9

obtaining petitioner's affirmative response that he understood, the court prepared to

10

formally take petitioner's plea.  The following interaction then took place:

11
12
13

> The Court:    You have had an opportunity as we talked about before to discuss the charges, the facts, the possible defense [sic] and consequences with your attorneys in this particular case?

14

> Petitioner:[5]   Yes.

15
16

> The Court:    And you are entering your plea today freely and voluntarily because that's what you want to do today; is that correct?  Is that right?

> Petitioner:   (Shakes head.)

17
18
19

> The Court:    Why don't you have a seat just a moment.  Your attorneys are there to help you.  Go ahead, have a seat.

20

Exhibit 10 at 6815.  At that point, an off-the-record conversation took place between

21

petitioner and his counsel.  *Id.*  Mr. Clark then informed the court that they could proceed,

22

and the following colloquy ensued:

23
24

> The Court:    Mr. Boswell, you are entering your plea today freely and voluntarily on your own accord with full understanding of all the matters set forth in this agreement; is that correct?

25

> Petitioner:   Yeah.

26

> The Court:    Have any promises been made to you other than

27

28

       [5]In place of the state court's identification of petitioner as "The Defendant," this Court has inserted "Petitioner" for the sake of consistency.

United States District Court

For the Northern District of California

| | | |
|---|---|---|
| 1 | | what we have stated on the record here in open court? |
| 2 | Petitioner: | No. |
| 3 | The Court: | Defendant indicates no.  Are you under the |
| 4 | | influence of any drugs, medication or alcohol at this time? |
| 5 | Petitioner: | No. |
| 6 | The Court: | Have any threats been made to you to force you to |
| 7 | | enter your plea here today? |
| 8 | Petitioner: | No. |

9  Exhibit 10 at 6816.

10        Petitioner claims that during the off-the-record conversation, he told Mr. Clark that he

11  did not want to plead guilty and wanted to go to trial, but "Mr. Clark said that he did not

12  want to go to trial."  Traverse at 7.

13        As further evidence to support his claim of coercion, petitioner refers to a letter that

14  Mr. Clark sent him after the plea had been entered, apparently in response to petitioner

15  having notified Mr. Clark that he intended to challenge the validity of the plea.  Mr. Clark

16  wrote to petitioner:

17        I got yours and wanted to let you know that I will not deny what I did to get
      you to take the deal.  You felt it was the best we could do given all of the
18        circumstances.  So don't trip, I am a grown man and can take the heat.

19  Petitioner's Exhibit H.

20        Petitioner states that although the letter does not specifically say what Mr. Clark did

21  in order to get petitioner to accept the plea, "the court can infer from his letter he did

22  something unethical."  Traverse at 7.

23        The alleged off-the-record statements made by Mr. Clark to petitioner during the

24  plea colloquy are neither confirmed nor denied in the record.  But even assuming that Mr.

25  Clark did tell petitioner that he did not want to go to trial, this statement does not amount to

26  coercion.  "Mere advice or strong urging by [counsel or] third parties to plead guilty based

27  on the strength of the state's case does not constitute undue coercion."  *Iaea,* 800 F.2d at

28  867.  There is no allegation that Mr. Clark threatened to withdraw if petitioner did not agree

**United States District Court**
For the Northern District of California

1   to plead guilty, *see id.*, nor is there evidence that he exerted mental coercion "overbearing

2   the will of the defendant." *Brady v. United States,* 397 U .S. 742, 750 (1970).  The letter

3   written by Mr. Clark also does not evidence anything untoward.  And importantly, at the

4   time he entered his plea petitioner represented in open court that no threats had been

5   made to force him to do so.  In sum, petitioner has failed to present sufficient evidence that

6   Mr. Clark made any threats, misrepresentations, or other improper promises to rebut the

7   "strong presumption of verity" of his guilty plea.  *See Blackledge v. Allison,* 431 U.S. 63, 74

8   (1977).

9               *d.*     *Conclusion*

10       The state court's rejection of petitioner's ineffective assistance of counsel claim was

11   not contrary to, or an unreasonable application of, clearly established federal law, 28

12   U.S.C. § 2254(d)(1), or based on an unreasonable determination of the facts in light of the

13   evidence presented in the state court proceeding, *id.* § 2254(d)(2).  Accordingly, this claim

14   for habeas corpus relief is denied.

15   *B.*     *The Voluntary Nature of the Plea*

16        *1.*     *Background*

17       Petitioner claims that his plea was involuntary because he was not advised of the

18   actual terms and consequences of the plea agreement.

19       Petitioner entered his guilty pleas on August 19, 1999, in open court and in the

20   presence of his attorneys Mr. Clark and Mr. Herro, Deputy District Attorney McCardle, and

21   Judge Sillman.  Before beginning the plea colloquy, the court noted its understanding that

22   the plea agreement had been reduced to writing, that petitioner was prepared to enter guilty

23   pleas to all charges and enhancements, that petitioner was waiving all of his rights to

24   pursue "any appeal on any and all issues" related to the cases, that he was waiving his

25   right to pursue any writ challenging the cases, and that he was waiving his right to withdraw

26   his guilty plea.  Exhibit 10 at 6809-10.  The court noted that it understood that petitioner

27   was prepared to do this after Mr. Clark and Mr. Herro had "spent an extensive amount of

28   time discussing this proposed disposition" with petitioner.  Exhibit 10 at 6809.  The court

**United States District Court**
For the Northern District of California

also noted it understood that, in exchange for these actions by petitioner, he would "receive a sentence of life imprisonment without possibility of parole instead of the death penalty," and that he would receive the aggravated term or the upper term on the crimes to which he pleaded guilty and to any enhancements.  Exhibit 10 at 6810.  The court then stated that it understood that petitioner was agreeing to all sentences running consecutively.  Exhibit 10 at 6810.

The court then stopped and said to petitioner:

> As we go through this, Mr. Boswell, because of the seriousness of this, if at any time you have any questions that you want to ask the court or you want to ask your attorneys, please indicate that and we will take a moment to do that.

Exhibit 10 at 6810.

The court continued, advising petitioner that his guilty plea meant that he was admitting each of the crimes and enhancements charged, including that he used a handgun and that he "committed a murder of Rodolfo Arnaldo" while "committing a burglary of his business" and armed robberies of the other victims.  Exhibit 10 at 6810.  Next, the court addressed the terms of the sentences that petitioner would receive for each offense and enhancement to which he was pleading guilty.  Exhibit 10 at 6810-12.

The court then engaged in the following colloquy with petitioner.

> The Court:   Mr. Boswell, have you in fact had an opportunity to read the entire document that has been prepared by the attorneys concerning your entry of your plea of guilty to these charges and admitting the enhancements as the court has outlined?
>
> Petitioner:   Yes.
>
> The Court:   And do you have any questions that you would like to ask the court before we start going through each of the aspects that are necessary for you to change your plea?
>
> Petitioner:   (Shakes head.)
>
> The Court:   Okay.  Did you in fact also go over the rights form with your attorney, Mr. Clark, in which you were explained each and everyone of your constitutional rights and you did sign and date and initial the rights form?

**United States District Court**

For the Northern District of California

| | | |
|---|---|---|
| 1 | Petitioner: | Yes. |
| 2 | The Court: | And the rights form is going to be incorporated into |
| 3 | | the proposed disposition that has been prepared by the attorneys in this particular case.  Mr. |
| 4 | | Boswell, if you would stand, we will proceed with your constitutional rights and your change of plea |
| 5 | | in this particular case. |
| 6 | | Your true name is Richard Dean Boswell? |
| 7 | Petitioner: | Yes. |
| 8 | The Court: | And you understand that you are requesting the court to allow you to withdraw your pleas of not |
| 9 | | guilty and enter pleas of guilty to all counts in this particular case and admit all enhancements in |
| 10 | | these two cases that are before the court [ ].  Is that your understanding? |
| 11 | Petitioner: | Yeah. |
| 12 | The Court: | And do you understand the sentence that you will be receiving as outlined by the court is you will be |
| 13 | | receiving life imprisonment without parole, in exchange for your plea here today, the district |
| 14 | | attorney is indicating with the concurrence of the victim's family that they will not be proceeding by |
| 15 | | way of jury trial in which they will be asking for a death penalty.  You understand? |
| 16 | Petitioner: | (Nods head.) |
| 17 | The Court: | Did you in fact read and understand each and |
| 18 | | everyone of these constitutional rights? |
| 19 | Petitioner: | Yeah. |
| 20 | The Court: | You understand in this particular case as in all cases, Mr. Boswell, you have an absolute right to |
| 21 | | a speedy and public trial by jury, and in this case as to both aspects of your case, as to a guilt |
| 22 | | phase and if necessary a penalty phase.  Do you understand that right? |
| 23 | Petitioner: | Yes. |
| 24 | The Court: | Do you give up that right? |
| 25 | Petitioner: | Yeah. |
| 26 | The Court: | You understand you have the right to see, hear |
| 27 | | and question the witnesses, against you; understanding that right, do you give up that right? |
| 28 | | |

21

| | | |
|---|---|---|
| 1 | Petitioner: | Yeah. |
| 2 | The Court: | You understand you have the right to bring in witnesses on your own behalf and present evidence on your own behalf, do you understand those rights? |
| 3 | | |
| 4 | | |
| | Petitioner: | Yes. |
| 5 | | |
| | The Court: | And do you give up those rights? |
| 6 | | |
| | Petitioner: | Yes. |
| 7 | | |
| | The Court: | Do you understand that you have the right to remain silent? |
| 8 | | |
| 9 | Petitioner: | Yeah. |
| 10 | The Court: | And do you give up that right? |
| 11 | Petitioner: | Yes. |
| 12 | The Court: | You understand that the penalty that you will receive in this particular case as we stated is life imprisonment without parole. |
| 13 | | |
| 14 | Petitioner: | Yes. |
| 15 | The Court: | You also understand that there is a restitution fine that must be ordered by the court, the maximum of ten thousand dollars for each case, do you understand? |
| 16 | | |
| 17 | | |
| | Petitioner: | Yes. |
| 18 | | |
| | The Court: | You have had an opportunity as we talked about before to discuss the charges, the facts, the possible defense and consequences with your attorneys in this particular case? |
| 19 | | |
| 20 | | |
| 21 | Petitioner: | Yes. |
| 22 | The Court: | And you are entering your plea today freely and voluntarily because that's what you want to do today; is that correct?  Is that right? |
| 23 | | |
| 24 | Petitioner: | (Shakes head.) |
| 25 | The Court: | Why don't you have a seat just a moment.  Your attorneys are there to help you.  Go ahead, have a seat. |
| 26 | | |
| 27 | | (Discussion between defendant and his counsel.) |
| 28 | Mr. Clark: | We can proceed, your Honor. |

22

United States District Court

For the Northern District of California

1
2
3

The Court:    Mr. Boswell, you are entering your plea today freely and voluntarily on your own accord with full understanding of all the matters set forth in this agreement; is that correct?

4

Petitioner:    Yeah.

5

The Court:    Have any promises been made to you other than what we have stated on the record here in open court?

6
7

Petitioner:    No.

8

The Court:    Defendant indicates no.  Are you under the influence of any drugs, medication or alcohol at this time?

9

Petitioner:    No.

10
11

The Court:    Have any threats been made to you to force you to enter your plea here today?

12

Petitioner:    No.

13

The Court:    And you are a citizen of the United States; is that correct?

14

Petitioner:    Yeah.

15
16

The Court:    And you have personally read, signed and viewed and initialed the rights form as well as the written proposed disposition; is that correct?

17

Petitioner:    Yeah.

18

The Court:    I'm sorry?

19

Petitioner:    Yes.

20
21

The Court:    And you are in fact pleading guilty today to these charges because you are in fact guilty and that's what you want to do today?  Is that also correct?

22

Petitioner:    (Nods head.)

23
24

The Court:    And this is your signature that you placed on the form, Richard Boswell, with the date of birth of August 9th, 1974?

25

Petitioner:    Yes.

26
27
28

The Court:    Do you have any questions you would like to ask the court before you – we go through the process and procedure of you entering your plea on each of these charges and the enhancements?

23

Petitioner:    No.

Exhibit 10 at 6812-17.

The court then proceeded to inquire as to petitioner's pleas as to each offense and enhancement.  Petitioner pleaded guilty to all the charges by saying "Guilty," and affirmed each of the enhancements by responding "Yes."  Exhibit 10 at 6817-23.

After receiving all of petitioner's pleas, the court asked Deputy District Attorney McCardle if he requested any additional admonitions of petitioner.  Mr. McCardle then asked the court to clarify that when asked about whether he read and understood the rights he was waiving that this entailed both forms – the standard rights form (Exhibit 12) and the special form (Exhibit 11).  Exhibit 10 at 6823.   The following exchange then occurred:

The Court:    You understand, Mr. Boswell, that there were two places for your signature, you did in fact sign and date both sides of those forms, your signature and your entry of your pleas today and your acknowledgment that the court is going to ask in just a few minutes means that you are in fact pleading guilty to each and everyone of these charges, that you are in fact admitting the enhancements and that you are giving up your constitutional rights, you are in fact understanding what the maximum penalties will be and what your sentence will be, that of life imprisonment without parole, and that you are giving up each and everyone of your rights to appeal or to seek any type of review of this case, do you understand?

Petitioner:    Yes.

The Court:    And that's exactly what you want to do, and the reason you are doing that is in exchange for having the district attorney drop the possibility of the death penalty being imposed; is that correct?

Mr. Clark:    Your Honor, just as it's not a quid pro quo to him. He is simply taking responsibility for all of these acts and understands the court is going to impose the sentence.

The Court:    Mr. Boswell, you do understand that your are giving up as indicated the constitutional rights and your right to appeal and review by any courts of your plea, and of any aspects of the case?

Petitioner:    Yes.

24

United States District Court

For the Northern District of California

| | |
|---|---|
| The Court: | And this was in fact your signature? |
| Petitioner: | Yes. |
| The Court: | Mr. Clark, any additional admonitions that you would like the court to include? |
| Mr. Clark: | No, your Honor. |
| The Court: | Or Mr. Herro. |
| Mr. Herro: | No, your Honor. |
| The Court: | The court does find there is a factual basis for the entry of the pleas in case 980134 and 980534. Court does accept the pleas at this time. |
| | The court also finds the defendant understands the possible penalty and consequences of his plea, understood his constitutional rights, knowingly, voluntarily and intelligently waives each of these rights, understands the consequences of entry of his pleas, factual basis for the entry of the pleas and the sentence that the defendant will receive. |

Exhibit 10 at 6824-25.

   2.    *Applicable Federal Law*

Due process requires that a guilty plea be both knowing and voluntary because it constitutes the waiver of three constitutional rights: the right to a jury trial, the right to confront one's accusers, and the privilege against self-incrimination. *See Boykin v. Alabama*, 395 U.S. 238, 242-43 (1969). The long-standing test for determining the validity of a guilty plea is "'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Parke v. Raley*, 506 U.S. 20, 29 (1992) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). This requires a review of the circumstances surrounding the plea. *See Brady v. United States*, 397 U.S. 742, 749 (1970). Of particular importance is that the defendant enter a guilty plea with sufficient awareness of the relevant circumstances and likely consequences, *id.* at 748, and that he understand the law in relation to the facts, *McCarthy v. United States*, 394 U.S. 459, 466 (1969). A plea is not voluntary unless it is "entered by one fully aware of the direct

**United States District Court**

For the Northern District of California

consequences" of the plea. *Brady*, 397 U.S. at 755

In *Blackledge v. Allison,* 431 U.S. 63 (1977), the Supreme Court addressed the presumption of verity to be given the plea proceeding record when the plea is subsequently challenged in a collateral proceeding.  While noting that a defendant's representations at the time of his guilty plea are not "invariably insurmountable" when challenging the voluntariness of his plea, the Court stated that, nonetheless, those representations, as well as any findings made by the judge accepting the plea, "constitute a formidable barrier in any subsequent collateral proceedings.  Solemn declarations in open court carry a strong presumption of verity." *Blackledge,* 431 U.S. at 74.

> *3.     Analysis*

The trial court's finding that petitioner understood the terms and consequences of the plea agreement, and that he "knowingly, voluntarily and intelligently" waived each of his rights is entitled to a presumption of correctness, which petitioner has not rebutted by clear and convincing evidence to the contrary.  *See* 28 U.S.C. § 2254(e)(1).  Rather, the record shows that, prior to entry of the plea, petitioner discussed the plea thoroughly with his attorneys, including options other than pleading guilty; that he specifically acknowledged his understanding of the sentences he was to receive and the rights he was waiving; and that, after consulting with his attorneys during the plea colloquy, he acknowledged that he was freely and voluntarily entering into the plea agreement "of his own accord," and because he was "in fact guilty" and "that's what [he] want[ed] to do."

Although petitioner was reluctant to plead guilty until three weeks before he was set to go to trial, this does not call into question the validity of his decision to do so when it is clear from the record that he was fully informed of the terms and consequences of his plea and a factual basis existed to find him guilty of the crimes charged.  Petitioner's aversion to pleading guilty notwithstanding, the record shows that he made a voluntary and informed decision to do so, understanding that it was the best he could expect under the circumstances of the case.

The state court's rejection of petitioner's claim was not contrary to, or an

**United States District Court**
For the Northern District of California

1  unreasonable application of, clearly established federal law, 28 U.S.C. § 2254(d)(1), or

2  based on an unreasonable determination of the facts in light of the evidence presented at

3  the state court proceeding, *id.* § 2254(d)(2).  Accordingly, this claim for habeas corpus relief

4  is denied.

5  *C.    Whether The Plea Agreement Has Been Breached*

6  Petitioner claims that the plea agreement has been breached because he was

7  required to agree to additional waivers of his appellate rights not included in the initial plea

8  offer.

9  "[W]hen a plea rests in any significant degree on a promise or agreement of the

10  prosecutor, so that it can be said to be a part of the inducement or consideration, such

11  promise must be fulfilled."  *Santobello v. New York*, 404 U.S. 257, 262 (1971).  A party

12  breaches a plea bargain if it fails to live up to the promises it made under the agreement.

13  *See Buckley v. Terhune*, 441 F.3d 688, 698 (9th Cir. 2006) (en banc).  Neither the

14  defendant nor the government is bound by a plea agreement until it is approved by the

15  court.  *See United States v. Washman*, 66 F.3d 210, 213 (9th Cir. 1995) (citation omitted).

16  Once the court makes the requisite factual findings and accepts the plea, the terms of the

17  plea agreement are "fixed" and enforceable.  *Brown v. Poole*, 337 F.3d 1155, 1159 (9th Cir.

18  2003).

19  The facts alleged by petitioner do not state a claim for breach of the plea agreement.

20  The more severe waiver provisions were offered by the prosecution as part of the plea

21  negotiations and petitioner, upon the advice of his counsel, agreed to those provisions.

22  Because the plea agreement approved by the court included the agreed-upon waiver

23  provisions, petitioner cannot argue that the prosecution breached the plea agreement by

24  adding them.  Accordingly, this claim for relief is denied.

25  //

26  //

27  **CONCLUSION**

28  For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  The

1   clerk of the court is directed to file as part of the record respondent's lodged Exhibits 1-14.

2   The clerk of the court shall also enter judgment and close the file.

3       **IT IS SO ORDERED.**

4
    Dated: December 1, 2006

5                                                              _____
                                                              PHYLLIS J. HAMILTON
6                                                             United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
    G:\PRO-SE\PJH\HC.01\Boswell3826.DenyHC.ECK
25

26

27

28

United States District Court
For the Northern District of California